Thank you and good morning. My name is Lawrence Semenza and I represent Marlene Stein who's the appellant in this matter. And before I begin the argument, the court had issued an order asking us to be prepared to answer whether or not there was sufficient allegation in order to have diversity in this case which would be in excess of $75,000. As the court is aware, the jurisdictional limit for district court in the state of Nevada is $15,000 which was alleged in the complaint. The damages being in excess of $15,000. Defendants moved to remove the case to federal court. The obligation was upon the plaintiff to move to have it remanded to state court if they believed that the amount of damages would be less than $75,000. It was my opinion that that would not be the correct course to ask for a remand to the district court because I believe that the damages that Mrs. Stein, Ms. Stein had incurred were in excess of $75,000. Are you making that representation as an officer of the $75,000? I am. Does the court have any other questions with respect to that issue that you asked us to be prepared to answer today? How would you break that down into categories? It is estimated and I believe that the defendants believe that Ms. Stein's medical bills were in excess of $80,000. Our calculation is that Ms. Stein's medical bills, treatment bills are in excess of $120,000. And was that known to you at the time of the removal? Is this something that developed after the fact or did you already have these bills in this amount at the time of the removal? I had that amount. I cannot speak for client, for counsel for the defendant. What was the nature of your client's injury exactly when she fell? Ms. Stein currently is 83 years of age and she suffered injuries to her back and to her shoulder. She had had a previous slip and fall many years before that had resolved and had not impinged upon her abilities to enjoy life, dancing, traveling. But as a result of the accident that occurred at Costco, she's unable to sit, she's unable to participate in one of her greatest joys which is as a professional poker player, which obviously entails a great deal of sitting and playing poker. Back injuries, she's had a number of injections not to sure the back problems that she has, the spinal issues, the... What evidence is there in the case, just turning to the merits and the summary judgment ruling, as to how it came to be that she slipped? Because there was some indication that there was something on the floor, it wasn't necessarily wet, but what is the evidence that she actually slipped on that substance? Well, the only evidence that she slipped on the substance was the fact that she did slip, that after the slippage, the Ms. Cornish, who was the lady who thinks she saw her go down with her feet in the air and down on the floor, she attempted to assist her, stayed with her for approximately 15 minutes until she was able to right herself and then, I guess, move off to see Mr. Manns, who was the store manager at the time. Ms. Cornish saw on the ground what looked like a skid mark and the photographs that are part of the record show some type of debris. Ms. Cornish felt that, first of all, it wasn't water, it wasn't liquid, it was... And she was back and forth on this issue as to whether or not, but it looked sticky to her, that looked like tomato, but it was dry, it wasn't fresh as such. And so the conclusion was, is that Ms. Stein had slipped on that material and fallen. No one is able to definitively say what the material was, whether or not it was the tomato product that was being demonstrated by Club Demonstration Services, one of the six or eight products that were being displayed that day and given as free samples. There was nothing on Ms. Stein's shoe that would indicate that the material that she slipped on was on her flats as such. So the only testimony we have is Ms. Stein's and Ms. Cornish saying that they believe that may have been the material. That material, as you know, was ultimately picked up by Mr. Manns with paper towel and discarded. It's not the policy that in his 10 years at Costco that you retain a substance that may have been the cause of a fall of a patron at Costco. Somebody took photographs of it, right? I it seems like they were just trying to clean it up and they documented it and they photographed it. Well, that may be your opinion, but I would think that just taking photographs of the material and not doing any further investigation, not contacting any of the club services to see whether or not a product was in fact being distributed that day, that being picked up, remember this particular accident occurred approximately 50 feet from the club demonstration services platforms, I guess, or carts that morning or that afternoon. And so it was in close proximity to where those foods were being distributed, given to customers. It did not take place at the food court, which is the other area in Costco where food products are sold and given to, or basically purchased by patrons, club members at Costco, and then they can walk away, take them throughout the store if they want. That's not the case. We're talking about an area of 50 feet from the club services at the end of the end caps. You've heard about end caps today, I think, in both of the previous arguments as such. The reason that the club demonstration services carts are close to the end caps is because more people go past those end caps coming in out of the various areas of the store to attract customers to come to try the products that are being demonstrated as such. I would say that in order to adequately determine whether or not club services, the contracted party with Costco, was basically, it was their product that caused slip and falls. You know, Mr. Mann said that in the 5, 10, or 15 slip and falls that had occurred during his period of time, and that excluded the other managers who may have had those slips and falls, he did not maintain, retain, or keep the material that was discovered on the floor, whether or not that's what caused the slip and fall, we don't know. But here you have basically the district court took away the ability of a jury to weigh the evidence of whether or not an hour walk-through would be sufficient to ensure that people don't drop materials on the floor, creating a hazard. This is this method of operation. What they do is they basically are trying to encourage patrons to purchase items that are demonstrated by club demonstration services. The list of items that each of the floor inspectors are supposed to look at is voluminous. I mean, they have to go through the pharmacy, the refrigerator, the freezers, they have to take the temperatures. In zone one, which is the vestibule, the front doors, trash, they look for trash, electrical hazards, emergency wards, optical department, entrance, exits, restrooms, both of the restrooms, both male and female, they have to go in and make sure that they're cleaned and all. What's the state of the evidence in terms of how long this substance was on the floor? There is no evidence as to how long the substance is on the floor, however, it was not fresh, it was not soft. Even Mr. Mars in his report indicates that it was dried foreign substance. So it wasn't fresh, it wasn't like you'd come from taking the chicken or the pizza or the pasta, excuse me, and dropping it on the floor, it would be fresh, it would be soft. Here, he indicated dried foreign substance. Did the plaintiff also, though, not testify that she had walked in this area somewhat recently and hadn't seen anything there? I don't think anyone saw anything in the area when you have that many people in a Costco. As they said, 400 people every half hour come in that store. Approximately 8,000 to 11,000 people a day. So, I mean, it's not normal, or at least it's not normal for me to be looking down when I'm walking anywhere. I'm trying to observe the fact that I'm not going to run into someone. A lot of people have carts and all, but I don't look down. Perhaps I should, but I don't. I'd like to reserve some time, if I could, as rebuttal. Yes, of course. Thank you very much. Okay, Mr. Federico. Make sure you unmute, sir. Yes, thank you. May it please the Court, my name is Michael Federico. I represent Costco, which is the appellee in this case, and I also want to take this opportunity to thank you for claiming my motion to allow me to appear remotely in this case. As you are aware, this is a premises liability case. The plaintiff was at my client's warehouse. The plaintiff went in there for a prescription and then decided to take a quick detour, so to speak, to go grab some wipes. She walked down the main aisle, didn't see the wipes, came right back, and that's when she fell. Instead of plaintiff proving his case or presenting evidence of liability, instead it turned out the defense, even though it didn't have to disprove the case. There's two portions of liability in this case to talk about. One would be the general maintain a reasonably safe property. In this case, we know from the undisputed evidence that Costco has hourly inspections, which we call floor walks, as opposed to some companies that call them sweeps. Every employee at Costco, every single one of them is charged with looking for potentially dangerous conditions, and if they find one, to either immediately remedy it or wait for somebody else to help. The policy is not even leave that and go get cones. They stand over and wait for somebody else to help. That is a policy, and the evidence demonstrated that that policy is implemented. In addition, managers are stationed at every department in the warehouse. Also, there was no other incident on the day in question relating to this particular substance that was near where plaintiff fell. Also, we know that employee Ms. Hillman, the evidence shows through her log and through her testimony that she was actually performing a floor walk between 1 30 p.m. on the day in question and I believe it's 2 13 p.m. The incident happened at 1 50 p.m. Does the record show that whether her floor walk, was her duties at that time specifically dedicated to observing safety issues, or was she doing other things at the same time? In terms of helping customers while she's doing a floor walk, what else is she doing? Other things? Stocking the shelves, or helping customers, or doing something else? She could be answering questions from customers as to, for example, where is a product located? Because obviously the warehouses are fairly large, but for the most part she's dealing with watching the floors. She has a mop, she has paper towels, things of that nature, making sure there's no hazards on the ground. But there are other tasks that they could perform too, for example, checking the... She has the testimony, her testimony was that she has a mop with her at the time she's doing this? Yes. Is it like on a cart, or is she just carrying, how is she doing this? I believe it's part of a, like a podium, almost. If you ever go in there and you'll see it, it's a bunch of things on like little, say, push cart podium. She didn't testify that she was doing it, that had one at the time, but that's the custom policy and practice. Okay, does the record show whether at the time she was doing the the floor walk on this day, and at that hour, whether she had this cart with the mop? No, she didn't have any recollection of that. Only testified as to her custom and practices. And she did not know where exactly she was in the warehouse at the time of the incident, because the incident was not, you know, she wasn't there at the time of the incident. The notion of liability is there's a concept that if a property owner has actual constructive notice of a unreasonably dangerous condition that the other party, and here the plaintiff is unaware of, you must either have a duty to warn or immediately remedy it. That's taken in three parts. We know in this case there's no evidence of the danger from Plaintiff's Counsel. There was no testing done on the floor. There was never any reference at any period of time during this case as to any expert retained. There was no evidence of any kind of code violations as to the slip resistance of the floor with or without any foreign object, with or without wetness, like for example on a bathtub. There's no evidence of safety violations. Counsel did nothing to develop that concept. As far as the reason to know. The fact that the substance wasn't preserved and examined, did that take away plaintiff's ability to explore whether the substance was something that would have established that the store employees had created it? For example, if it's juice it's hard to tell whether someone brought it in or it was in the store, but if it's a cleaning solution that somehow is left on the floor and left to harden, that could have established that that was a hazard created by the store, at which point the plaintiff would have benefited from a different legal framework and a different quantum of proof that's required. I don't believe so, your honor. As far as what my client did, they preserved the evidence as best as they could. I don't think it's practical to preserve for, I guess now it would be six years, some reddish substance that was on the ground that was easily wiped up with one paper towel, as best they could, within reason, with any kind of reasonable expectation, that would include photographing. We did have video but you couldn't see the floor, so you had photographs, you had witness statements as to what it appeared to be. I don't think it would have had I may have even asked for an expert to be able to go out there, if that answers your question. I'd like to mention that a spoliation argument, to the best of my recollection, I litigated this entire case, was never mentioned one time at all until the opposition to my motion for summary judgment was presented. So I personally don't think it's even, they have standing to make the argument, but assuming it was to answer your question, like I said before, I don't think it was a significant impediment because they could have put anything on the floor and tested it to see if the slip resistance met the standard, which was 0.5 or above, I forgot the exact terms, but that's what the engineers and the construction experts typically will do in cases that could be such as this. So it wasn't raised before the close of fact discovery? I apologize, I didn't hear you. So it wasn't raised until the close of fact discovery? Best of my recollection, not until after discovery closed and after I filed my motion for summary judgment, suddenly in the opposition that's part of the record, there's an argument about not preserving evidence and I think in my reply brief, first of all this isn't an issue because what were you going to do with it? You didn't ask to do anything, you didn't do anything with respect to expert discovery that one would sometimes experience in a premises liability case, Your Honor. I don't really, though, hear you, you're arguing that your client would lack constructive notice that if a third party is selling, you know, offering samples that you wouldn't be on constructive notice that those samples could fall on the floor or even that what was on the floor here might have been one of those samples. It seems really you're arguing there's just not evidence that she slipped on this substance and beyond that that you had a reasonable process for monitoring the floors. If you're referring to more of a motive operation argument, you know, I'll first say, Your Honor, that Plaintiffs' Counsel did not allege motive operation at all in the complaint. Second of all, did not focus, in my knowledge, anything on that until I think it was brought up in the court's order granting summary judgment. I could be mistaken, but I'm pretty sure that's the first time it popped up and motive operation, as we heard from the other cases, a situation where a store will basically have imputed knowledge based upon the fact that the store has delegated duties traditionally reserved for employees done by actually their customers. And the examples I can give where people try to impute that or maybe courts could possibly consider that would be, for example, in Las Vegas buffets. We don't have as many of them anymore, but when you go to a buffet and you're forced to serve yourself the corn and the peas and your children are doing the same thing and they're grabbing the spoons and putting on their plate, things fall. Now the person that watched and caused the falling of the items is not on their own notice and not the business, but there are kinds of motive operations because this is something that could be done by the business. That knowledge of the customer is basically the equivalent of knowledge by the company that's kind of indirectly hired the customer to do their job for them. I don't think we have that at all in this case. And even if you had evidence that club demonstration services serve something to somebody because they served it. It's not like somebody's coming up and, for example, going to a soda machine or an ice dispenser and having ice all over the place. I mean people are being served regularly and I'm talking hypothetically speaking as far as the demonstration services because otherwise if you say well there's constructive notice there, then every single company is on constructive notice of anything including a retailer that says they're selling socks because maybe people will drop a sock on the ground. Well then the argument would be well the store shouldn't have let the people walk through the store with the stock. The store should have bagged it up and walked it over to the cash register. I don't think that's a reasonable interpretation or extension of the motive operation theory. Another extension that could work is in the traditional produce section of the grocery store. Not the whole grocery store that sells groceries, but the produce section when they force people to grab grapes, put them into plastic containers, that kind of things. When they don't have fully contained objects and you're forced to serve yourself and walk away, that's the same kind of argument that people come to you with. I don't think anyone's suggesting that this is like a continuous hazard like ice under an ice machine. I don't think it's like that. But at the same time there's some amount of notice that somebody can drop something in a store. That exists already. I don't really hear you disputing that. I hear the argument more to be, well we took reasonable efforts to make sure that wouldn't happen and it's also not clear why the plaintiff fell. Any store has noticed that something could happen and the duty therefore is not to have a perfectly safe premises where there's a guarantee. A Plaintiff's Counsel wants you to believe, I think he said, he didn't say guarantee, but guarantee of safety that an incident wouldn't happen. The property has to be reasonably safe and as far as the notice element, constructive notice, it just didn't exist in this case. Otherwise you'd have somebody saying, okay well because somebody picked up a can, a bottle of juice and it spilled, well that's motive operation because we're selling juice. I don't think at all that that's the standard of standard that the big box retailers or any other companies are held to. What does the record show as to how long the substance was on the ground? We don't have an exact time, but what we do have, number one, is we have a floor walk taking place from 130 to 213 with an incident happening at 150. And more importantly, we have two things from the Plaintiff. One, that she had just walked by and I think from the exact same place when she walked to go look for wipes which Costco was out of and she immediately walked back and walked right by the same area and I asked her if she took a different route to exit. She said no. It was the same path. Is that consistent with the substance being dried? Well, as to whether when the substance ended up on the ground, whether it was dry already. You know, for example, it came up somebody's shoe, it was something out of somebody's pocket, like a dried up piece of gum. You know, we don't have, we don't know that. We don't know the source of it and if you, we don't have the video and evidence, but I'll just explain that the video shot was from very far away and you can only see her going down and I've said that we have that, but we do not know when that substance appeared. What we do know is that we have floor walks as a policy and that policy is implemented through testimony and documentation. It's not some company that might say, sure, we do sweeps every hour and don't do any at all on a daily basis. You know, we have the documents and the testimony in this case and then we have the Plaintiff admitting one, she just went by the same area, didn't encounter it and in fact from Plaintiff's own brief on page two, they say third to last, third to last line, first full sentence, there were a lot of people in the store and Stein was making sure she didn't step on the heels of the person in front of her, aka looking down. So that's what we have as far as how long it could have, how short of a period of time it could have been on the floor for. That's evidence of it though. To the second aspect of liability, we covered the lack of danger, the lack of notice. The third part, I think we've already covered it really, as far as not known to the Plaintiff, what we know is out in the open, it was in the main aisle. It's not like that foster case where you have something that's partially concealed. It was also undisputedly reddish-orange in color. Plaintiff submitted that she was looking down at her heels at the time of the incident. I don't think it was a situation that would have been unknown to her. As far as the vendor, I think it's pure speculation. They had two vendors in the approximately 100,000 square foot warehouse. One might have been within 50 feet. There is no evidence that anything from the vendor ended up on the floor 50 feet away. And even had that been the case, you're still looking at how long it was on the floor for. We know from the Plaintiff's own admissions, approximate time period. As far as the mode of operation, I think I've already covered that. I was going to address that further. Spoliation, I think we've already covered by your honors. And the subject matter jurisdiction, the Plaintiff's counsel did cover. I'm going to run out of time. Do you want me to finish or no? Let me see if my colleagues have any additional questions for you. It appears not, and your time is at the end. And so I want to thank you for your argument, Mr. Federico, and we'll hear from Mr. Semenza. Thank you all for your time. Again, may it please the court. Briefly, what we have here is a slip and fall within 50 feet of where club services is providing free samples to customers. It didn't happen in software, didn't happen at the front door, didn't happen in the bathrooms, didn't happen at the logging dock. It happened in the close proximity of where food is for free to customers at Costco. The substance, in a perfect world, would be that it had been retained. We would be able to see whether or not it came from, as Mr. Federico says, chewing gum or some other substance. But that opportunity was taken away by the destruction of that substance. A 1,000-square-foot store, it's a megastore. And to have a floor walker take approximately, I think it was 35 minutes, to go through the store and do the list of items that that person was supposed to do does not give a jury the comfort, I believe, if it were argued and presented, that they were providing a free sample. It is not adequate inspections to ensure that food products that are given away in the store are being accounted for that the safety of the patrons. It was approximately 51 and a half years ago that I had my first argument before the Ninth Circuit. Judge They had studied the record, and that if I had anything else to say, I could say it, but they had no questions for me. If the panel has no questions for me, I would like to thank you for the opportunity to appear on behalf of Ms. Stein. I just have one very short question. Do you have a specific number? You said within 50 feet of the sample area, but do you have a specific number in terms of what that distance actually was? Mr. Maine's report indicated that it was within 50 feet from a food demonstration service. That was on the exhibit, the confidential information that was provided by and filled out by Mr. Maine's. Thank you. Thank you, Your Honor. Thank you very much. I want to thank all counsel for the helpful briefing argument in this case. This case is submitted. That concludes our calendar for today. It also concludes our calendar for the week. The panel wants to thank the staff at the Browning Courthouse for their excellent work here and assistance throughout the week, and we now are adjourned. Thank you all.
judges: BRESS, FORREST, Ohta